IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JUANITA WAY, *Plaintiff*, v. ASPIRA INC. OF PENNSYLVANIA, *Defendant*. | CIVIL ACTION No. 17-0579 |

**PAPPERT, J.**　　　　　　　　　　　　　　　　　　　　　　　March 20, 2018

## MEMORANDUM

Juanita Way sued her former employer ASPIRA Inc. of Pennsylvania for wrongful termination in violation of Pennsylvania's Whistleblower Law, 43 Pa. Cons. Stat. §1421, *et seq.*, and wrongful discharge in violation of Pennsylvania public policy. Way contends that she was unlawfully terminated for engaging in protected activities, including objecting to allegedly illegal financial practices and cooperating with a federal investigation. ASPIRA moved for summary judgment. After reviewing the parties' briefs, thoroughly reviewing the record and holding oral argument (during which Way withdrew her wrongful discharge claim), the Court grants the Motion and enters judgment for ASPIRA on the Whistleblower claim.

I

ASPIRA is a Charter Management Organization (CMO) that provides management services, including financial, maintenance, staffing and other services, for five charter schools. (Def.'s Mot. for Summ. J., Ex. C ("Way Dep.") at 12:25–13:8, 29:14–23, ECF No. 27-6; Def's Stat. of Facts ¶ 24 n.8, ECF No. 27-3.) Way worked as an

Accounts Payable Coordinator for ASPIRA from May 2011 until her termination in August 2016. (*See* Mot., Ex. B, ECF No. 27-5; Mot., Ex. K, ECF No. 27-14.) In her position, Way was responsible for processing invoices, writing checks, securing check signatures, mailing payments in a timely fashion, reconciling disputes with vendors, and handling month-end closes. (Way Dep. at 12:25–13:8, 35:6–8.)

On December 23, 2015, Way was contacted by the FBI and U.S. Attorney's Office regarding ASPIRA. (*Id*. at 41:25–42:18.) She was interviewed that day and provided information on ASPIRA's financial practices, including how contractors were hired, how they were paid and whether they performed the designated work. (*Id*. at 44:1–45:22.) In January 2016, Way told four colleagues about her cooperation with investigators: then CFO Murray Rosenman, consultant Roger Masch, Controller Orlando Rendon and Harold Bickings, ASPIRA's Payroll Manager. (*See id*. at 12:9–14, 15:15–16:5, 17:22–18:4, 55:10–16, 56:23–57:1, 60:22–25; Mot., Ex. D at ¶ 6, ECF No. 27-7.) Way does not know whether anyone else at ASPIRA knew that she spoke to investigators, although she "assumed" that Rosenman would tell other executives. (*See* Way Dep. at 62:3–15.)

In April 2016, Rosenman was replaced by Interim CFO Irv Williamson. (*See id*. at 15:15–17; Mot., Ex. F at ¶ 9, ECF No. 27-9.) Upon assuming his role, Williamson took issue with "how accounts payable was functioning at the time." (Way Dep. at 19:8–16; *see also id*. 20:10–20; Ex. F at ¶ 10.) Specifically, it was revealed that ASPIRA was unintentionally $1.2 million past due on payments to Keystone, its health insurance provider. (*See* Way Dep. at 19:17–25; Ex. F at ¶ 11–12.) ASPIRA and Keystone subsequently agreed on a payment plan to remediate the debt; in exchange

for a reduced balance of $900,000, ASPIRA agreed to pay off the debt in installments over a 12 month period, in addition to its monthly premium payments. (*See* Way Dep. at 19:17–21:17, 31:5–10; Ex. F at ¶ 12–14.)

Way alleges that over the following months, she was asked to engage in financial improprieties for ASPIRA on two occasions. First, Way claims that in May 2016 Williamson asked her to remove the $900,000 debt owed to Keystone from ASPIRA's books and apportion it to its five charter schools. (*See* Way Dep. at 29:6–13, 30:23–31:10, 72:3–14.) Way understood this as an attempt by ASPIRA executives to manipulate ASIPRA's books to make its financial health appear more favorable so that it could secure the bond funding it needed to acquire a target college. (*See id.* at 63:3–64:8, 66:6–13.) She further alleges that she felt this was improper because "[t]hese were not the school's bills" and "they shouldn't have to pay more if it wasn't their employees." (*Id.* at 32:15–22.) Way claims she told Williamson and Rendon that she was concerned about this practice but ultimately complied with the request. (*See id.* at 32:6–10, 66:6–14, 72:15–18.) Way made no other reports about this conduct prior to her termination. (*See id.* at 67:11–25, 68:11–16.)

The second alleged financial impropriety is that on one occasion in the summer of 2016, Williamson apparently asked Way to pay a contractor who had already been paid. (*See id*. at 70:1–17.) Way testified that:

> He gave me the invoice, [told] me he needed a check right away, I went to enter it . . . found out it was the exact same invoice . . . took it back to him saying, "I can't pay this, it was already paid[.]" He instructed me that I needed to get a check to that person, and I said I couldn't do it unless I had an invoice to pay it against.

3

(*Id*. at 70:1–17.)  Way does not know whether the vendor was ultimately paid twice but stated that she never issued a second check.  (*Id*. at 71:5–13.)  There is no evidence that Williamson ever pursued the matter further and Way did not identify any other individual to whom she reported this conduct.  (*Id*. at 70:1–71:15; Ex. D at ¶ 3, 5.)

In August 2016, Keystone terminated ASPIRA's health insurance coverage, which left its employees and the employees of its charter schools without health insurance for approximately two weeks.  (Way Dep. at 34:24–35:2; Ex. F at ¶ 25, 28.) The parties dispute the reasons for Keystone's decision; however, the parties agree that Keystone did not receive a payment by the date required in the negotiated payment plan.  (*See* Way Dep. at 34:24–35:2; Ex. F at ¶ 25.)  ASPIRA asserts that Way failed to obtain the needed signatures and failed to mail the check by the required deadline. (*See* Ex. F at ¶ 26; Ex. K.)  ASPIRA contends that Keystone's termination of coverage was based on the lack of timely payment under the payment plan.  (*See* Ex. F at ¶ 25.) Way feels that she was not responsible for the late payment because she told Williamson that the checks were not signed in time and that Keystone's decision to terminate coverage was actually based on ASPIRA's decision to switch insurance carriers.  (*See* Way Dep. at 35:3–5, 36:1–12, 37:1–20.)  Way states that when ASPIRA sent Keystone a letter of cancellation after the two parties had negotiated the payment plan in good faith, Keystone declared the payment plan null and void, and demanded payment of ASPIRA's debt in full.  (*See id*. at 37:1–20.)

Way was fired on August 25, 2016.  (Ex. K.)  Thomas Darden, ASPIRA's COO, made the decision to terminate Way based in part on Williamson's recommendation. (Ex. F at ¶ 2, 29; Mot., Ex. G at ¶ 27, ECF No. 27-10.)  Way's termination letter states

she was fired because her "failure to perform [her] assigned duties contributed to [a] critical vendor cancelling a key insurance policy, which resulted in significant harm to the organization's reputation, and exposed employees to unnecessary and potentially significant insurance related risks." (Ex. K; *see also* Way Dep. at 72:23–25.) Williamson and Bickings were the only people employed by ASPIRA who knew of any of Way's alleged protected activities at the time of her termination. (*See* Way Dep. at 17:14–21, 56:11–57:1.) Bickings never supervised Way during her employment. (*See id.* at 57:2–3.)

On February 7, 2017, Way filed a two-count Complaint alleging wrongful termination in violation of the Whistleblower Act and Pennsylvania public policy. (Compl.) Way claims that she was fired for a "culmination" of activities, including (1) participating in the federal investigation of ASPIRA's financial practices, (2) objecting to ASIPRA's distribution of the $900,000 insurance debt to its schools, and (3) refusing to engage in the overpayment of a contractor. (*Id.*) ASPIRA contends that Way has not established a *prima facie* case under the Whistleblower Act, fails to show that ASPIRA's explanation for her discharge was pretextual, and that Way cannot recover on a common law wrongful discharge claim for allegedly illegal conduct in which she participated. Faced with the record evidence supporting ASPIRA's position on the wrongful discharge claim, Way's counsel withdrew it during oral argument. (*See* Hr'g Tr. at 38:17–19.) The Court grants ASPIRA's Motion on the remaining Whistleblower claim because there is no evidence in the record that Way's firing was connected to any report she may have made of any wrongdoing or waste.

5

II

A

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A mere scintilla of evidence in support of the non-moving party will not suffice; there must be evidence by which a jury could reasonably find for the non-moving party. *Id.* at 252. Summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In reviewing the record, a court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009) (quotation omitted). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

B

To establish a *prima facie* Whistleblower Act violation, an employee must show that she made a good faith report of an instance of wrongdoing or waste prior to the alleged reprisal by the employer. *See* 43 Pa. Cons. Stat. § 1424(b); *O'Rourke v.*

*Commonwealth*, 778 A.2d 1194, 1200 (Pa. 2001). "Wrongdoing" is "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 Pa. Cons. Stat. § 1422. "Waste" is "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." *Id.*

Importantly, "a plaintiff must 'show by concrete facts or surrounding circumstances that the report [of wrongdoing or waste] led to [the plaintiff's] dismissal, such as that there was specific direction or information received not to file the report or that there would be adverse consequences because the report was filed.'" *Golaschevsky v. Com., Dept. of Envtl. Prot.*, 720 A.2d 757, 759 (Pa. 1998) (modifications in original) (*quoting Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commw. Ct. 1994) *aff'd,* 669 A.2d 335 (Pa. 1995)). Plaintiff must present evidence of "concrete facts or surrounding circumstances" that "connect the report with the dismissal." *Id.* "[V]ague and inconclusive circumstantial evidence" is not sufficient. *Id.*

If a plaintiff establishes a *prima facie* violation, the burden shifts to the defendant to prove "by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual." *O'Rourke*, 778 A.2d at 1200 (quoting 43 Pa. Cons. Stat. § 1424(c)). This means that "the employer must prove that it would have taken the same adverse employment action absent the employee's good-faith report of wrongdoing." *Id.* at 1205 (citation omitted). "The burden shifts to the defendant . . . only where plaintiff has satisfied the threshold

7

showing of a causal connection." *Evans v. Thomas Jefferson Univ.*, 81 A.3d 1062, 1070 (Pa. Commw. Ct. 2013) (citing *O'Rourke*, 778 A.2d at 1200).

III

Way cannot establish a *prima facie* case because there is no record evidence from which a reasonable jury could find the requisite causal connection between her alleged protected activities and her termination. In addition to evidence of a "'specific direction [] . . . not to file the report or that there would be adverse consequences because the report was filed[,]'" *Shearn v. W. Chester Univ. of Pa.*, No. 14-3706, 2017 WL 1397236, at *6 (E.D. Pa. Apr. 19, 2017) (quoting *Evans*, 81 A.3d at 1070), evidence of "temporal proximity between the protected activity and the alleged discrimination" or "the existence of a pattern of antagonism in the intervening period" can support a showing of a causal connection. *McAndrew v. Bucks Cty. Bd. of Comm'rs*, 982 F. Supp. 2d 491, 505 (E.D. Pa. 2013) (citation omitted). Courts may also "consider the record as a whole to determine whether a retaliatory motive can be inferred." *Id.*

Even if all of Way's conduct was protected,[1] there is no evidence in the record that Williamson, Rosenman or any other ASPIRA employee directed Way not to speak with federal investigators, not to report alleged financial improprieties, or otherwise advised Way that there would be adverse consequences for her reporting activities. In fact, when asked how Rosenman, Masch, Rendon and Bickings responded to her disclosure that she met with federal investigators, Way stated, "The [executive] officers . . . were not shocked by it . . . that's what I got from their reactions." (Way Dep. at

---

[1] ASPIRA does not dispute that cooperating with federal investigators is a protected activity, but argues that Way fails to show how her resistance to "misappropriating" the Keystone debt and resisting vendor overpayment qualify as good-faith reports of waste or wrongdoing as defined by the Whistleblower Act. (Mot. at 7 – 12.)

8

57:9–16.) Nothing about this reaction supports an inference that she was later terminated for her cooperation. Further, when asked why she believed her termination was related to the meeting with investigators, Way testified that Rosenman was subsequently let go, Masch resigned, Rendon told her to start looking for a new job and then left in July, and that in the summer, which is their slow time, she was asked to train a new employee. (*See* Way Dep. at 57:22–58:10, 60:20–21.) None of this shows how Way's participation in the federal investigation into ASPIRA's financial conduct is related to, resulted in, or had any influence on her termination eight months later.

Nor can Way rely on temporal proximity to raise the inference of a causal connection. Way informed her colleagues of the meeting with investigators approximately seven months prior to her termination and resisted "misappropriating" the debt three to four months prior. Such lengthy gaps have repeatedly been held to be "simply too long to infer [causal connection] based on temporal proximity alone[.]" *McAndrew*, 982 F. Supp. 2d at 505 (holding six months too long); *see also Urey v. Grove City College*, 94 F. App'x 79, 81 (3d Cir. 2004) (four months generally creates no inference). A further problem for Way is that there is no record evidence that either of the people responsible for her termination, Williamson or Darden, knew of the meeting with investigators, and both deny such knowledge. (*See* Ex. F at ¶ 31; Ex. G at ¶ 29.) Way's mere speculation that Rosenman may have told others is not sufficient evidence from which a jury could find that Williamson or Darden had the requisite knowledge. (*See* Way Dep. at 62:3–15; Hr'g Tr. at 23.)

The only allegedly protected conduct that occurred close in time to Way's termination was her resistance to suspected vendor overpayment. However, Way

9

cannot show that her conversation with Williamson regarding the payment of the vendor constitutes a report of waste or wrongdoing to support the requisite causal connection. The Whistleblower statute only protects reports of waste or actual violations of laws, statutes, regulations, or codes. *See, e.g.*, *Sukenik v. Twp. of Elizabeth*, 131 A.3d 550, 556 (Pa. Commw. Ct. 2016) ("The test is objective; it is irrelevant whether an employee believes the employer's conduct constitutes wrongdoing, an actual violation is required.") (citing *Kimes v. Univ. of Scranton*, 126 F. Supp. 3d 477, 493 (M.D. Pa. 2015)); *Sukenik*, 131 A.3d at 555–56 ("[R]eports of vague or subjectively wrong conduct are not considered wrongdoing under the Whistleblower Law.") (citing *Riggio v. Burns*, 711 A.2d 497, 501 (Pa. Super. Ct. 1998)). The record contains no facts from which a reasonable jury could find that an alleged instruction to pay a vendor, possibly for a second time, evidences an actual violation of a law, statute, regulation, or code or a "substantial abuse, misuse, destruction or loss of funds or resources." 43 Pa. Cons. Stat. § 1422. The record is silent regarding the amount of the requested overpayment and there is no evidence to show that the vendor was even paid more than once. *See Sukenik*, 131 A.3d at 559 ("[W]hen alleging that a substantial loss of funds constitutes waste, it is clear that some actual loss must occur. . . . hypothetical loss is insufficient to trigger the Whistleblower Law's protection.").

Further, there is no record evidence of a pattern of antagonism and Way fails to point to any, either in her brief or at oral argument. It fell to ASPIRA to speculate as to what, if any, evidence Way could cite in this regard. All ASPIRA could come up with was alleged "difficulties" Way had with Williamson. (*See* Hr'g Tr. at 6–20.) There is no evidence to suggest, however, that any such "difficulties," to the extent any were found

10

in the record, arose because of or in relation to Way's alleged protected activities. *Compare Shearn*, 2017 WL 1397236, at *6 (plaintiff failed to show causal connection to survive summary judgment where conduct plaintiff perceived to be retaliatory started before plaintiff's report of wrongdoing and presented no evidence that adverse changes after her report were related or in response to her report), *with McAndrew*, 982 F. Supp. 2d at 505–06 (plaintiff survived motion to dismiss where complaint contained allegations of past instances of direct retaliation that nudged plaintiff's claim across the line from possible to plausible). Generally having a contentious relationship with one's boss is the very sort of vague and inconclusive circumstantial evidence that is insufficient to establish causation.

Instead, Way's argument comes down to little more than a belief, unsupported by record evidence, that she engaged in protected activities and was later fired for doing so. Way contends that this is a case of a "snowball gathering speed" and the causal connection can be inferred from the culmination of her numerous reports of waste or wrongdoing. (Pl.'s Resp. in Opp'n at 2.) At oral argument, counsel stated that "what happened" between the December 2015 meeting with investigators and Way's August 2016 termination was indicative of a causal connection. (*See* Hr'g Tr. at 23:3–24:20, 36:4–37:17.) The only purported evidence of "what happened" that Way apparently refers to are the alleged protected activities, which are alone not enough to establish causation. "[T]he mere fact that [a plaintiff's] discharge occurred a few months after [plaintiff's] report of wrongdoing . . . are <u>not enough</u> to show a causal connection." *Shearn*, 2017 WL 1397236, at *6 (emphasis and modification in original) (quoting *Evans*, 81 A.3d at 1070).

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***
GERALD J. PAPPERT, J.